[Civ. No. 11547. First Appellate District, Division Two.—January 10, 1941.]

AXIS PETROLEUM COMPANY (a Corporation) et al., Respondents, v. ISABELLE H. TAYLOR et al., Appellants.

William M. Taylor and Solomon Rosenbaum for Appellants.

John M. Hall for Respondents.

STURTEVANT, J.—In the plaintiffs' complaint they asked to have a decree entered quieting their title, except as to a lease hereinafter called the head lease, to Lot 4 in Block H of Signal Hill Tract in the City of Signal Hill in Los Angeles County. They also asked for declaratory relief. The defendants answered and filed a cross-complaint. The latter pleading was answered. The defendants asked for an unlimited decree quieting their title, that they be given possession, that the head lease be ordered cancelled, and for other

relief. The trial court made findings in favor of the plaintiffs and the defendants have appealed from the judgment.

(1) July 22, 1921, defendant Isabelle H. Taylor, made an oil lease to John C. Ort, Jr. This will be herein referred to as the head lease.

(2) July 23, 1921, John C. Ort, Jr., made an oil lease to Big Jumbo Oil Company.

(3) October 23, 1922, defendant Isabelle H. Taylor, deeded to defendants Arthur W. Hjorth and Anna O. Hjorth, an undivided one-half interest in the land.

(4) January 29, 1925, Big Jumbo Oil Company made an oil sublease to L. T. McCutcheon and Harold A. Gilman, as trustees for Wigle & McBride, Inc.

(5) April 29, 1925, L. T. McCutcheon and Harold A. Gilman, as trustees for Wigle & McBride, Inc., assigned to plaintiffs, Walter Hughes and R. H. Bess, a one-half interest in the sublease of January 29, 1925.

(6) November 1, 1928, L. T. McCutcheon and Harold A. Gilman, as trustees for Wigle & McBride, Inc., assigned to plaintiff, Axis Petroleum Company, a one-half interest in the sublease of January 29, 1925.

(7) April 12, 1929, plaintiffs Walter Hughes, R. H. Bess and Axis Petroleum Company, defendants Isabelle H. Taylor, Arthur W. Hjorth and Anna O. Hjorth, and Big Jumbo Oil Company, entered into a written agreement. This is referred to by defendants and will be herein referred to as the deepening agreement.

(8) Thereafter and about July, 1929, defendants Taylor and Hjorth, executed a writing appointing Western Trust and Savings Bank (Long Beach) their "distributing agent for such money as actually comes into its hands from rentals, gas and oil." This will be herein referred to as the distribution order. Each instrument, (1)-(8) inclusive, was introduced in evidence or was admitted either expressly by the pleadings or by failure to deny. (Code Civ. Proc., secs. 447 and 448.)

It was the theory of the plaintiffs that they had in all respects done and performed every covenant contained in the head lease. On the other hand it was the claim of the defendant lessors that the plaintiffs had breached material covenants, that for that reason the defendants had duly terminated the lease, and the plaintiffs should be ordered to surrender possession to the defendants. We have read the plead-

ing and the findings and the bill of exceptions. We find no merit in any of the attacks. The record does not present a case of conflicts in the evidence. There was not a substantial conflict in it. No question of real merit was involved. The action was tried throughout on its merits with meticulous care.

■ The termination of the lease, the defendants contend, arose by operation of two notices which were served on the plaintiffs. The first notice dated July 21, 1933, asserted that the plaintiffs had defaulted in two different respects. It recited that the plaintiffs had failed to keep the well on production. The covenant contained in the lease imposed the duty on the lessee to keep the well on production except for " . . . unavoidable causes beyond the control of the lessee . . . " The evidence showed without conflict that on July 21, 1933, and for a short period thereafter, the well was not on production. But it also showed, without conflict, that the perforated pipe used by the plaintiffs was by the operation of a well (located about 100 feet distant and operated by third persons) filled with mud. The evidence also showed that the plaintiffs at once proceeded with due diligence to avoid the obstructions caused by the acts of such third parties and that in about ninety days had the well again on production. There is no evidence that they did not act promptly and with all due speed.

■ The said notice specified as another default that the plaintiffs had not furnished the lessor with monthly statements of the production. It is perfectly clear that the lease imposed such an obligation on the plaintiffs. However the proof was all to the effect that such statements were furnished. It may be argued that such statements were not delivered to each of the defendants personally but there was no conflict in the evidence and the proof was clear that the Hancock Company, the purchaser of the oil, made out statements in due form and that the latter company delivered to the Western Trust and Savings Bank, the defendants' bankers, for the information of the defendants, the statements provided for in the lease.

The second notice, mentioned above, was given January 9, 1934. It specified no additional defaults but was solely based on the first notice and alleged a termination of the lease.

We have treated above the two defaults specified in the formal notice. However at the trial the defendants contended there were other defaults or breaches.

■ The defendants make the point that the plaintiffs were not entitled to gas produced from the well. The point requires us to state some additional facts. August 15, 1933, Isabelle H. Taylor and Big Jumbo Oil Company, the parties of the first part, entered into an agreement with R. E. Bering, the party of the second part, by the terms of which the parties of the first part " . . . hereby lease and agree to furnish and deliver to said party of the second part, for the purpose of manufacturing and extracting gasoline therefrom, all of the gas produced by them from the above described property, for and during the entire period of time they shall produce gas therefrom. . . . " By mesne assignments said instrument became the property of Signal Oil Company. Bering agreed to pay 30 per cent of the *proceeds* of manufactured gasoline to Big Jumbo Oil Company and 6 per cent to Isabelle H. Taylor. Bering also agreed that the *proceeds* would be estimated at *2½ and 3 cents* per gallon, respectively, under the retail price of Red Crown gasoline in Los Angeles for gasoline that tested 70 degrees Baume or over and for that which tested less than 70 degrees. The Signal Oil Company has paid Mrs. Taylor for her portion of all gas it received. That fact is evidenced by a contract dated February 11, 1936. Whether the Signal Oil Company has paid to the plaintiffs moneys it should have paid the Big Jumbo Company is a question not involved in this appeal because the latter company has not appealed.

When gas comes from an oil well it is called "wet gas". After it has been processed, that is dehydrated, the products of the processing are dry gas and gasoline. Those products are marketable. The plaintiffs delivered to the Signal Oil Company all wet gas, the latter processed it and accounted to the plaintiffs therefor. The latter charged to the defendants their part of the cost of processing and paid them their part of the proceeds of the sales. At this time they object to the costs of processing. They contend that no part of such costs should have been charged to them. But the lease contained no covenant on the part of the lessee to process gas. The trial court held that within a reasonable construction of the lease the charge was not improper. We think there was no error in the ruling.

Adjacent to Lot 4, Block H, the plaintiffs own another lot which is leased to Callahan who operates another well. The plaintiffs allowed him to locate on Lot 4 a boiler to operate his well. The defendants contend said act was a use of Lot 4 by the Axis Petroleum Company not authorized by the lease. If said act be considered a breach of the lease it was not a material breach and the trial court so held. The incident was never mentioned until the action was on trial.

All wet gas was piped to the Signal Oil and Gas Company. By the latter it was dehydrated. Some dry gas was piped back to the premises of the defendants and by the latter it was used as fuel to operate its boilers. All gas was measured by passing through meters. It was all accounted for.

The defendants contend the gas was used to operate wells on other properties. Some dry gas was transmitted by pipes through meters and used to operate the so-called Woods Well. Later an equal amount was in the same manner returned. In other words it was, in effect, a loan which was duly repaid.

The defendants contend that in June, July, August, and September, 1936, the plaintiffs overcharged for gas used on Lot 4. But the evidence showed although such was the fact the error was soon discovered and later no charge was made for gas that was used until the error had been adjusted and the account balanced.

The head lease provided that the royalties should be paid on or before the 15th day of each calendar month. The defendants introduced evidence to the effect that they were not, on many occasions, paid on time. But there was evidence they were paid and accepted. The plaintiffs may not predicate a forfeiture on such facts. (15 Cal. Jur. 786; *Boone* v. *Templeman*, 158 Cal. 290, 296 [110 Pac. 947, 139 Am. St. Rep. 126].)

The defendants assert the plaintiffs in violation of the terms of the head lease refused to permit them to examine the books of the Axis Company. There was no evidence supporting that assertion. In this same connection they say the Axis Company did not keep correct books and accounts. There was no direct evidence to that effect. The presumption is that it did.

In 1930 an action to quiet title was brought by Axis Petroleum Company against Wigle & McBride, Inc. It in

no manner affected the possession of the Axis Company. The head lease provided the lessee should promptly notify the lessor of "any jurisdiction proceedings brought to the attention of the lessee purporting to affect or affecting his possession hereunder." The Axis Company was granted a decree May 12, 1930. Manifestly such facts will not warrant any court in declaring a forfeiture.

The trial court made findings against the defendants on each of the foregoing attacks. There was evidence to support each of those findings and no one of them may now be disturbed.

Furthermore if there were any breaches the plaintiffs contend the defendants never legally gave notice thereof and took the proper steps to terminate the lease. The purported notice of default was signed by Mrs. Taylor only. She was a tenant in common with the Hjorths and Jumbo Oil Company. The latter neither joined with her nor authorized her to issue a declaration of forfeiture. A notice by her declaring a forfeiture was not sufficient at common law. In *Howard* v. *Manning*, 79 Okl. 165 [192 Pac. 358, 12 A. L. R. 819], the Supreme Court of Oklahoma made a thorough examination of the law back to and including "Coke upon Littleton". On page 363 that court said: "The alleged forfeiture for breach of covenant, not having been declared by declaration of forfeiture joined in by all the tenants in common, and the alleged forfeiture not being self-executing, the lease, in so far as this record shows, was a subsisting and valid lease for the entire year of 1917." (See, also, *McCormick* v. *Marcy*, 165 Cal. 386, 392, 393 [132 Pac. 449].) Our statutes have not changed said rules. True it is that in the case before us the Hjorths joined Mrs. Taylor in framing her answer and cross-complaint. That act may be said to be a ratification by them. (*Gill* v. *Bennett*, (Tex. Civ. App.) 59 S. W. (2d) 473, 475.) But it was in no manner a ratification by the Jumbo Oil Company. It follows that the notice of forfeiture was not effective.

On April 12, 1929, all of the interested parties executed another contract which they call the deepening agreement. Therein they agreed that the lessees should sink the well to a depth of 5,300 feet. The expense was not to exceed $20,000. The lessees were to keep accounts of the actual costs. Of those costs the lessors were to pay one-fourth.

Their portion of the cost was to be deducted from their royalties and, to that end, one-fifth of their royalties was to be withheld. The work was done by the Rotary Oil Company. It sent invoices to the plaintiffs. The latter, in turn, made a compilation of the account and sent a copy to Isabelle H. Taylor. The deepening was completed and on June 7, 1929, the well was again put in full operation. On November 20, 1936, the defendants served a notice of rescission of the deepening agreement. They now claim a finding in their favor should have been made on that issue. In their notice of rescission they stated it was based on the ''deceit, fraud, and misrepresentation . . . '' of the plaintiffs. In the entire record there is no evidence of any ''deceit, fraud, and misrepresentation . . . '' and the court so found. There was no attempt to make a tender. There was no attempt to excuse the delay in rescinding. They did not comply with the provisions of sections 1688–1691 of the Civil Code. There was no showing the defendants had been damaged by any act of the plaintiffs and therefore they were not entitled to rescind. (*Bancroft* v. *Woodward,* 183 Cal. 99, 106 [190 Pac. 445].) The defendants reply that action was based on alleged fraud. A complete answer is that the notice given by these defendants purported to rest on fraud. For that reason alone we think the distinction which the defendants attempted is insufficient. However there is another rule which we deem pertinent to the facts contained in this record. █ It will be noted that the deepening agreement was an independent agreement not going to the root of the head lease, the contract which the defendants now seek to forfeit. Under such circumstances the party's remedy is an action for damages. (*Walker* v. *Harbor Business Blocks Co.,* 181 Cal. 773, 780 [186 Pac. 356]; III Elliot on Contracts, sec. 2046.) █ Down to a date as late as December, 1936, the defendants collected their royalties. The defendants therefore waived plaintiffs' defaults, if any. (*Kern Sunset Oil Co.* v. *Good Roads Oil Co.,* 214 Cal. 435, 445 [6 Pac. (2d) 71, 80 A. L. R. 453].) Addressing themselves to this point counsel for defendants assert the defendants received payments from The Hancock Oil Company but not from the plaintiffs—because the plaintiffs had no agents. It is sufficient to state that The Hancock Oil Company bought all of the oil, and, by consent of all parties, paid defendants' royalties to their bankers who in turn paid the same to the defendants. Whether The

Hancock Oil Company acted as plaintiffs' agent, servant, or as a trustee, is not material.

The defendants contended they were overcharged for the costs incurred under the deepening agreement. The issue was tried with much care and a finding was made that the correct amount of said charges was $15,586.04 instead of $16,562.92, the amount shown on the statement sent Mrs. Taylor. But defendants claim said amount was still excessive in the sum of $4,003.61. That claim is based solely on the fact that certain charges were entered for April, May, and June, 1929, and that the work was actually done between May 1 and June 7, 1929. They claim no charge should have been allowed for any date except the period last stated. But they introduced no evidence as to the specific factors of the charges made for both earlier and later dates. *Non constat* charges were made for labor performed and materials furnished to get ready to do the work. And, perhaps some later charges were made of invoices for labor and materials furnished during the performance of the work, but not billed until a later date. They did not call any officer or employee of the Rotary Oil Company, the company that had done the work, but, as stated above, they relied solely on the wording of the statement sent to Mrs. Taylor. Said statement of the costs was rendered to Mrs. Taylor October 10, 1933. She acknowledged receipt thereof October 19, 1933. Defendants' contention that they did not see it until September 22, 1936, is incorrect. The plaintiffs believed the statement correct and paid Rotary Oil Company their part of costs as shown by the statement. In September, 1936, defendants' attorney, in plaintiffs' office, objected to thirteen items. Mr. Izenour, treasurer for the plaintiffs, said he would examine into those items. On September 30, 1936, plaintiffs' attorney advised Mr. Taylor, defendants' attorney, that three of the items amounting to $781 would be stricken out and that was done. When, on April 22, 1937, the defendants filed their answer and cross-complaint they sought to surcharge the account. In their answer to the cross-complaint the plaintiffs denied any errors were contained in the account. On the trial the burden was on the defendants to prove their affirmative allegations of new matter. (*Vanderslice* v. *Matthews,* 79 Cal. 273, 278 [21 Pac. 748].) They failed to meet that burden.

All taxes for mineral rights and well taxes for the years 1934, 1935, and 1936, were with the full knowledge of

the defendants paid by the plaintiffs. The trial court allowed $242.35 as a credit to the plaintiffs, that is, one-sixth of the amount of the taxes so paid. Claiming the head lease was terminated January 9, 1934, the defendants assert the plaintiffs had no right to be reimbursed for said sum. But as we have shown above the head lease has not been terminated. Hence the assertion of the defendants falls.

Prior to February 11, 1936, the parties discovered the confusion that had been created by the Bering contract, but that confusion was soon adjusted by a contract made on February 11, 1936, which was signed by Mrs. Taylor and Signal Oil Company. The defendants say that contract was not admitted in evidence. But it was pleaded by the plaintiffs and was not denied by defendants and therefore there was no need of introducing it in evidence. (*Knight* v. *Whitmore*, 125 Cal. 198, 200 [57 Pac. 891].)

The trial court in making findings set forth the alleged breaches. It also made a finding that the plaintiffs have faithfully performed their contract. The defendants point to those findings and assert they are contradictory. The assertion is without any foundation because, as we have shown above, the alleged breaches were not, in legal effect, breaches and the court so found.

The judgment is affirmed.

Nourse, P. J., and Spence, J., concurred.